**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IRINA KABAKOVA,<br><br>Plaintiff,<br><br>v.<br><br>OFFICE OF THE ARCHITECT OF THE CAPITOL,<br><br>Defendant. | Civil Action No. 19-1276 (BAH)<br><br>Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION**

The plaintiff, Irina Kabakova, brings this action against her former employer, the Office of the Architect of the Capitol ("AOC"), under the Congressional Accountability Act ("CAA"), 2 U.S.C. §§ 1301, *et seq*., alleging discrimination and retaliation based on sex, national origin, disability, and whistleblowing, *see* First Amended Compl. ("FAC"), ECF No. 17. Under the version of the CAA applicable to the plaintiff's claims, exhaustion of administrative remedies is a jurisdictional prerequisite to filing an action in federal court. *See Blackmon-Malloy v. U.S. Capitol Police Bd*., 575 F.3d 699, 705 (D.C. Cir. 2009) ("Congress intended counseling and mediation to be jurisdictional requirements."). The defendant has moved to dismiss the amended complaint, under Federal Rule of Civil Procedure 12(b)(1), based on this jurisdictional requirement and, under Rule 12(b)6), for failure to state a claim upon which relief can be granted. *See* Def.'s Mot. to Dismiss Amended Compl. ("Def.'s Mot."), ECF No. 21. For the reasons explained below, the defendant's motion is granted.

## I. BACKGROUND

During and after plaintiff's four years of employment with defendant, she initiated no fewer than five, sometimes overlapping administrative complaints, and was herself the subject of

a fraud investigation by the AOC Office of Inspector General ("OIG"), all of which presents a tangle to tease out the various threads of her claims. These administrative matters and their factual underpinnings, as alleged in the plaintiff's complaint, are described below, followed by review of the procedural history of this suit.

### A. Factual Allegations

Plaintiff began working at AOC in July 2014. FAC ¶ 9. In the two-year period relevant to this suit — March 2016 to her termination on April 14, 2018 — she was a Safety and Occupational Health Manager. *Id*. Her duties included "visiting . . . sites and buildings at the Capitol" to "conduct[] safety inspections and investigations." *Id.* According to the complaint, before March 2016, plaintiff "had no issues working under . . . supervisors Chrissy Widener or Ken Eads, receiving outstanding ratings, outstanding performance awards, special contribution awards, and quality step increases." *Id.* ¶ 10.

John Kelly became plaintiff's supervisor in March 2016. *Id.* ¶ 11. Immediately, the complaint alleges, the plaintiff "began experiencing gender, national origin, and age discrimination" from Kelly. *Id.* ¶ 11. The plaintiff, who was born in current-day Ukraine, was 49 years-old at the time. *Id.* ¶ 7. Kelly allegedly "[o]n more than one occasion, told Kabakova that she needed 'to work to deserve it,'" that she needed to "earn it back," that he would "not give her an outstanding evaluation even if she perform[ed] outstandingly," that "she needed to work harder." *Id.* ¶ 12. As support for the gender discrimination claim, the complaint alleges that Kelly "on one occasion" made comments like this "with his hand on Kabakova's knee." *Id.* ¶ 13. On other unspecified occasions, Kelly allegedly touched the plaintiff's hair and hugged her. *Id.* ¶¶ 13, 15. In addition, Kelly allegedly stated that the plaintiff was "not 'the same breed'" as another female employee, who had been characterized by a fourth party as "very flirtatious." *Id.* ¶ 18–19. Finally, the complaint alleges: "Shortly after Kelly began" supervising

the plaintiff, "he promoted the only male employee under his supervision and gave him several awards despite his underperformance." *Id.* ¶ 23.

Regarding national origin discrimination, plaintiff alleges that "[o]n multiple occasions, Kelly mocked Kabakova's accent, telling her he could not understand her." *Id.* ¶ 20. Additionally, "[i]n late 2016, or January or February 2017, Kelly accused Kabakova of copying secret security documents because of her national origin." *Id.* ¶ 81.

Lastly, regarding age discrimination, plaintiff alleges that "[s]hortly after Kelly began, he requested that subordinates provide him their resumes. After reviewing Kabakova's resume, Kelly told Kabakova that because of her age and experience, she did not need additional training." *Id.* ¶ 21.

Between March and December 2016, Kelly allegedly attempted to lower plaintiff's rating on her previous year's performance review, *id.* ¶ 25, pushed plaintiff to cancel her telework agreement, *id.* ¶¶ 29–37, and denied funds for plaintiff to attend a training, *id.* ¶ 38, 41. Kelly also allegedly denied plaintiff approval to attend another training in March 2017. *Id.* ¶ 109

On December 20, 2016, plaintiff "asked Kelly to allow" her time off "from work to file an [Equal Employment Opportunity ("EEO")] complaint" alleging that he was discriminating against her based on sex, *id.* ¶ 61, but the complaint does not indicate his response or whether the plaintiff was given the time off. "On December 21, 2016, the plaintiff initiated EEO contact, and met with EEO Counselor Ed Lopez regarding her claims," *id.* ¶ 62, of "sexual harassment, discrimination, and the existence of a hostile workplace," *id.* ¶ 56. By February 15, 2017, the EEO investigation was complete and EEO reported to plaintiff in a meeting "that no discrimination was found." *Id.* ¶ 84. That same day, Lopez allegedly "told Kabakova that Kelly

had interfered with the [EEO] investigation." *Id.* ¶ 86. Upon hearing this, plaintiff tried to withdraw her complaint, *id.* ¶ 91, but EEO "sent a memo of decision," *id.* ¶ 92.

After the December 2016 EEO investigation, Kelly allegedly "retaliated against Kabakova" by "ask[ing] Kabakova to do obscure and menial tasks" and by "isolat[ing] Kabakova from her team members and coworkers." *Id.* ¶¶ 72–73, 76.

"In late March 2017," according to the complaint, plaintiff and Kelly began clashing over safety after "Kabakova told Kelly that he was violating several safety policies and . . . standard operating procedures." *Id.* ¶ 101. Then, "[o]n April 5, 2017, Kelly claimed he was unaware that safety inspection or upkeep [were] part of Kabakova's responsibilities, telling her [that] he would consider whether to cooperate with her inspections" in the future. *Id.* ¶ 99. "As Kabakova continued to perform her safety inspection duties," the complaint adds, "Kelly refused to cooperate, a refusal that willfully violated safety requirements." *Id.* ¶ 100.

On April 13, 2017, plaintiff, while performing an inspection, "slipped down a flight of stairs and hit her head, resulting in a traumatic brain injury and multiple orthopedic injuries." *Id.* ¶ 122. The plaintiff has not returned to work since then. *Id.* ¶ 125.

The week after the fall, AOC filed a claim on the plaintiff's behalf with the Department of Labor ("DOL") Office of Workers' Compensation Program ("OWCP"). *Id.* ¶ 129. While OWCP was processing the claim, in May 2017, Kelly allegedly "forced" plaintiff "to take annual and sick leave" and "denied her leave without pay requests." *Id.* ¶ 132. Then, in early June, AOC told OWCP "that it was challenging Kabakova's claim," a decision the complaint alleges was made "on Kelly's recommendation." *Id.* ¶ 133. Kelly, the complaint says, believed there were "significant . . . unusual circumstances surrounding the incident." *Id.* ¶ 130. On August 3, 2017, OWCP denied the claim, and plaintiff appealed. *Id.* ¶¶ 134–35. The appeal was

successful, and OWCP ultimately "approved Kabakova's workers compensation claim" on December 7, 2017. *Id.* ¶ 158.

While her appeal was pending, Kelly allegedly removed plaintiff from the team's email list, *id.* ¶ 137, deleted plaintiff's files about occupational health and safety from the shared computer drive, *id.* ¶ 138, and "place[d] Kabakova on AWOL status," *id.* ¶ 139. Also while the appeal was pending, in November 2017, Kelly initiated a complaint with the OIG "alleging that Kabakova submitted a fraudulent workers compensation claim, that she submitted false forms for wage loss," and that she otherwise violated AOC policy by not returning to work after her injury. *Id.* ¶ 141. An OIG report concluded "based on preponderance of the evidence, the employee committed [Federal Employees' Compensation Act] fraud when they fabricated an injury and made false statements by submitting a claim for compensation." *Id.* ¶ 143 (quoting OIG Report Number I-2018-01). "The employee also violated AOC policies when they were absent from work without supervisory approval and did not cooperate with the AOC OIG during the investigation." *Id.* (quoting OIG Report Number I-2018-01).

According to the complaint, OIG continued to investigate the plaintiff into the summer of 2018, issuing another statement on August 8, 2018. *Id.* ¶ 194. That statement, however, was about a separate complaint plaintiff made that "an AOC manager" was "abusing their authority." 2018-0013–INVI-P: Architect of the Capitol (AOC) Employee Responsibilities; Government Ethics; and Standards of Conduct: Substantiated.[1] These allegations "were not substantiated" by OIG. *Id.* The complaint alleges that all of OIG's findings were false. *See* FAC ¶ 148, 202, 204.

---

[1] This statement by the OIG, available at https://www.oversight.gov/sites/default/files/oig-reports/18-0013-I%20Oversight_gov%20Final.pdf, may be relied on in assessing the motion to dismiss because it was "incorporated in the complaint," *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 183 (D.C. Cir. 2006), through plaintiffs' heavy reliance, *see* FAC ¶¶ 194–204; *see also, e.g., Phillips v. Fulwood*, 616 F.3d 577, 582 n.3 (D.C. Cir. 2010) (considering a document incorporated in the complaint and relied on by the plaintiff). In any event, judicial notice may always be taken of "facts in the public record," such as this OIG statement. *See Covad Commc'ns Co. v. Bell Atl Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

Finally, the complaint alleges that "[o]n April 14, 2018, plaintiff was terminated because, according to AOC, she had not fully recovered from her injury in April 2017 and did not return to work." *Id.* ¶ 176.

**B. Administrative Matters**

As the administrative basis for the instant claims, the complaint references three administrative matters 18-AC-53, 18-AC-63, and 19-AC-04. *See* FAC ¶¶ 186, 206, 208. The defendant's motion to dismiss identifies two additional, relevant administrative matters initiated by the plaintiff: 18-AC-34 and 19-AC-26. *See* Def.'s Mem. Supp. Mot. to Dismiss at 7 ("Def.'s Mem."), ECF No. 21. All five of these administrative matters are described to aid in evaluating whether the instant claims satisfy the jurisdictional exhaustion requirement.[2] Importantly, as discussed in more detail *infra* Section III.A, under the CAA, "[a] request for counseling shall be made not later than 180 days after the date of the alleged violation," and such a request is a prerequisite step in the administrative process before "commenc[ing] a proceeding." 2 U.S.C. § 1402(a) (1995). Thus, in describing each administrative matter, identification of the 180-day period preceding the request for counseling is crucial because any alleged incident occurring outside such period is not, by definition, subject to administrative review and is thus not properly exhausted.

[2] As explained *infra* Part II, in deciding a motion to dismiss for lack of subject matter jurisdiction, "the court may consider the complaint supplemented by undisputed facts evidenced in the record," such as the records of the administrative matters submitted by the parties as exhibits to their briefing on the motion to dismiss. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). Consideration of these formal documents about the administrative matters for purposes of evaluating whether the plaintiff properly exhausted her claims does not require conversion of the motion to dismiss to a motion for summary judgment. *See Vasser v. McDonald*, 228 F. Supp. 3d 1, 9 (D.D.C. 2016) (analyzing this issue at length); *see also Ahuja v. Detica Inc.*, 742 F.Supp.2d 96, 103 (D.D.C. 2010) (considering administrative materials at motion to dismiss when neither party disputes the materials' authenticity); *Redmon v. U.S. Capitol Police*, 80 F.Supp.3d 79, 83 (D.D.C. 2015) (same).

**1. No. 18-AC-34**

Plaintiff requested counseling in matter 18-AC-34 on May 16, 2018. Def.'s Mot., Declaration of Aisha Murray ("Murray Decl."), Ex. 6, Notification of Invocation of Mediation in Case No. 18-AC-34 ("18-AC-34 Mediation Notice") at 1, ECF No. 21-3, so the 180-day window preceding the May 16, 2018 request opened November 17, 2017 and encompasses the plaintiff's termination, on April 14, 2018. The Notification of Invocation of Mediation stated that matter 18-AC-34 concerned allegations of "harassment, interference with [Family Medical Leave Act ("FMLA")], and termination because of disability and reprisal." *Id.* (stating also that the plaintiff requested mediation on July 5, 2018).

After the close of mediation, the plaintiff elected to file an administrative complaint, rather than to file suit in federal court. *See* Murray Decl., Ex. 7, Order: Withdrawal of Complaint with Prejudice ("18-AC-34 Order") at 1, ECF No. 21-3. While motions for summary judgment on the administrative complaint were pending, the plaintiff emailed OWCR asking to withdraw the complaint. *Id.* at 1–3. The hearing officer granted the request to withdraw with prejudice, on February 25, 2019. *Id.* at 2 ("Because the request was made at a relatively late stage in the proceedings, the complaint is withdrawn with prejudice." (capitalization altered)).

**2. No. 18-AC-53**

Plaintiff requested counseling in matter 18-AC-53 on July 13, 2018. *See* Def.'s Reply Mem. in Supp. Mot. to Dismiss FAC ("Def.'s Reply"), Supplemental Decl. of Aisha Murray ("Murray Supp. Decl."), Ex. 1, Notification of Invocation of Mediation in Case No. 18-AC-53 ("18-AC-53 Mediation Notice"), ECF No. 25-1. In the request for counseling, the plaintiff handwrote as the "basis for filing," "gender discrimination" and "retaliation (complaints about sex harassment, gender discrimination, workplace safety)" and "hostile work environment." Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n"), Ex. 3, Formal Request for Counseling at

1, ECF No. 23-5. The 180-day window preceding the July 13, 2018 request opened January 14, 2018 and thus encompasses the plaintiff's termination.[3]

Plaintiff sought mediation in this matter on November 5, 2018. *See* 18-AC-53 Mediation Notice at 1. The Notice of Invocation of Mediation identified the allegations in the matter as "unfair terms and conditions, denial of a step increase, interference with processing of benefits and Worker's Compensation claim because of disability, and reprisal." *Id.* Notice of the end of the mediation period was sent via first class mail on February 4, 2019. *See* Pl.'s Opp'n, Ex. 3, End of Mediation Notice, ECF No. 23-5.

**3. No. 18-AC-63**

On August 17, 2018, the plaintiff sought counseling a third time, in 18-AC-63. *See* Def.'s Mot., Murray Decl., Ex. 2, Notification of Invocation of Mediation in Case No. 18-AC-63 ("18-AC-63 Mediation Notice") at 1, ECF No. 21-3; *see also* Pl.'s Opp'n, Ex. 1, Formal Request for Counseling, ECF No. 23-3. The 180-day window preceding that counseling request opened February 18, 2018, about two months prior to the plaintiff's termination. Plaintiff requested mediation in this matter on November 6, 2018, and the Notification of Invocation of Mediation listed the allegations at issue as "unfair terms and conditions, discipline, hostile work environment, and termination because of disability, and reprisal." 18-AC-63 Mediation Notice at 1. Notice of the end of the mediation period was mailed on February 4, 2019. *See* Pl.'s Opp'n, Ex. 1, End of Mediation Notice, ECF No. 23-3.

---

[3] Without explanation, the plaintiff asserts that the 180-day window opened on Friday, January 12, 2018, *see* Pl.'s Opp'n at 4, not Sunday, January 14, 2018. No conclusion in this decision turns on whether the window opened on January 12 rather than January 14.

#### 4. No. 19-AC-04

The plaintiff again sought counseling on October 12, 2018, in 19-AC-04. *See* Def.'s Mot., Murray Decl., Ex. 3, Notification of Invocation of Mediation in Case No. 19-AC-04 ("19-AC-04 Mediation Notice") at 1, ECF No. 21-3; *see also* Pl.'s Opp'n, Ex. 2, Formal Request for Counseling, ECF No. 23-4. The 180-day window preceding this request opened on April 15, 2018, the day after the plaintiff's termination. Plaintiff requested mediation in this matter on February 19, 2019, and the allegations at issue were "harassment, disparate treatment, hostile work environment, and termination because of age, national origin, disability, sex, and reprisal." 19-AC-04 Mediation Notice at 1. The plaintiff received notice of the end of the mediation period via e-mail on March 26, 2019. *See* Pl.'s Opp'n, Ex. 2, End of Mediation Notice, ECF No. 23-3.

#### 5. No. 19-AC-26

Finally, the plaintiff sought counseling on February 12, 2019 in 19-AC-26. *See* Def.'s Mot., Murray Decl., Ex. 4, Notification of Invocation of Mediation in Case No. 19-AC-26 at 1 ("19-AC-26 Mediation Notice"), ECF No. 21-3. She requested mediation on March 28, 2019, and the topics identified for mediation were "inaccurate compensation, damaged reputation, false accusations, fraudulent statements, unlawful procurement of medical records, production of inaccurate pay records, denied investigation, and interference with Workers' Compensation process because of age, national origin, and reprisal." *Id.* Notice of the end of the mediation period was sent via first class mail on May 1, 2019. *See* Def.'s Mot., Murray Decl., Ex. 5, End of Mediation Notice ("19-AC-26 End of Mediation Notice"), ECF No. 21-3.

### C. Procedural History

The plaintiff filed this suit on May 1, 2019, *see* Complaint (May 1, 2019), ECF No. 1, and filed an amended complaint on October 30, 2019, *see* FAC.[4] The amended complaint pleads eight counts: discrimination based on sex (Count I), national origin (Count II), age (Count V), and disability (Counts VI and VII); and retaliation based on sex (Count III), national origin (Count IV), and whistleblowing (Count VIII).

With the filing of the defendant's reply at the end of January 2020, the defendant's motion to dismiss the amended complaint is now ripe for resolution.

## II. LEGAL STANDARD

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). A court that "lacks subject-matter jurisdiction" over an action has no authority to adjudicate it and "must dismiss the action." FED. R. CIV. P. 12(h)(3)). "The objection that a federal court lacks subject-matter jurisdiction, may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y & H Corp.*, 546 U.S. 500,

[4] At the time of filing her original complaint, plaintiff was represented by an attorney, who later filed a motion to withdraw, which was granted on July 25, 2019. *See* Min. Order (July 25, 2019) (granting motion docketed at ECF No. 5). Plaintiff briefly proceeded *pro se*, *see* Response to Notify the Court Whether She Has Retained Counsel, ECF No. 11, before retaining new counsel, who entered an appearance on September 16, 2019, *see* Notice of Appearance for Plaintiff (Sept. 16, 2019), ECF No. 13, and represented plaintiff through the filing of the FAC and the briefing on the defendant's pending motion to dismiss. On February 21, 2020, after briefing on the pending motion to dismiss was completed, plaintiff's second counsel moved to withdraw, *see* The Employment Law Group, P.C.'s Motion to Withdraw its Representation of Plaintiff Irina Kabakova and Notice Pursuant to Local Rule 83.6(c), ECF No. 26, which motion was granted over the plaintiff's opposition, *see* Min. Order (Feb. 27, 2020) (discussing ECF No. 27, the plaintiff's opposition). While plaintiff was directed to notify the Court by April 8, 2020 whether she has obtained new counsel, *see* Min. Order (March 13, 2020), no new counsel has entered an appearance on plaintiff's behalf, so she is currently *pro se*. In an April 9, 2020 notice, the plaintiff confirmed that she is currently proceeding *pro se* and requested that the case be stayed while she looks for new counsel, *see* Pl.'s Response to the Court's Order Dated March 13, 2020, ECF No. 30, which request is DENIED.

506–07 (2006) (citation omitted0. One vehicle for raising such an objection is a motion to dismiss under Rule 12(b)(1). *See* FED. R. CIV. PROC. 12(b)(1).

In some cases, a court may "dispose of a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) on the complaint standing alone." *Herbert*, 974 F.2d at 197. In other cases, "[w]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* (first citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981); then citing *Land v. Dollar*, 330 U.S. 731, 735 n. 4 (1947); then citing *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987); then citing *Wilderness Soc'y v. Griles*, 824 F.2d 4, 16–17 n. 10 (D.C. Cir. 1987); and then citing 5A C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 1350, at 213 (1990)); *see also, e.g.*, *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("In 12(b)(1) proceedings, it has been long accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to entertain the case.'" (quoting *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 362–63 (D.C. Cir. 1982)). In the former type of case, the motion to dismiss is cast as a facial challenge, while in the latter, the motion poses a factual challenge. *See Haase*, 835 F.2d at 908 (explaining that some 12(b)(1) motions call for "an examination of the face of the complaint," while others require factual investigation); *see also e.g.*, *Gould Electronics v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (using the terms "facial challenge" and "factual challenge"); *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C. 2003) ("In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments." (quoting *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993)). Here, the defendant's motion to

dismiss is a factual challenge, as it necessarily turns on examination of "the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert*, 974 F.2d at 197; *see also Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (noting court may consider "facts developed in the record beyond the complaint").

Even in evaluating a factual challenge like this one, "the court must still accept all of the factual allegations in [the] complaint as true." *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (internal quotation marks omitted) (alteration in original). The court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

To survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012). In deciding a motion under 12(b)(6), the court must consider the whole complaint, accepting all factual allegations as true, "even if doubtful in fact." *Twombly* at 555. Courts do not, however, "assume the truth of legal conclusions, nor do [they] 'accept inferences that are unsupported by the facts set out in the complaint.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (alteration in original) (internal citation omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

## III. DISCUSSION

The discussion proceeds as follows. As a threshold matter, the exhaustion provisions of the CAA enacted in 1995 and in effect until June 19, 2019, which apply to plaintiff's claims, are reviewed. Next, the plaintiff's claims are considered in four groups. First, the claims of discrimination based on age and of discrimination and retaliation based on national origin are dismissed for failure to exhaust. Second, the claims of disability discrimination are dismissed because they are either precluded by the plaintiff's decision to pursue an administrative complaint in 18-AC-34 or were not properly exhausted. Third, the claim of whistleblower retaliation is dismissed for failure to state a claim on which relief can be granted. Finally, the claims of sex discrimination are dismissed because aspects of these claims are untimely and those aspects that are timely fail to state a claim.

### A. Applicable CAA Exhaustion Provisions

The CAA "extended the protections of Title VII of the Civil Rights Act of 1964, as well as ten other remedial federal statutes, to employees of the legislative branch," including employees of the AOC. *Blackmon-Malloy*, 575 F.3d at 701; *see also* 2 U.S.C. § 1301(a)(3)(F) (applying the CAA to the AOC). The version of the CAA applicable here requires a legislative branch employee to exhaust a three-step administrative process before filing a complaint in federal court seeking judicial relief under the CAA. *Blackmon-Malloy*, 575 F.3d at 701.[5] In *Blackmon-Malloy*, the D.C. Circuit concluded that "Congress intended the three-step process to be jurisdictional." 575 F. 3d at 705. Put differently, *Blackmon-Malloy* held that a federal court

---

[5] Congress amended applicable provisions of the CAA in 2018, in the Congressional Accountability Act of 1995 Reform Act ("2018 Reform Act"). *See* Pub. L. No. 115-397, 132 Stat. 5297 (2018). For reasons explained *infra* note 7, the 2018 amendments are not applicable to this suit. As noted, the citations to the exhaustion provisions of the CAA are to the applicable versions, enacted in 1995.

lacks jurisdiction over any claim brought under the CAA that has not been properly exhausted through the three-step process described below.

First, before "commenc[ing] a proceeding, a covered employee . . . shall request counseling." 2 U.S.C. § 1402(a) (1995). Importantly, "[a] request for counseling shall be made not later than 180 days after the date of the alleged violation." *Id.* The office that handles counseling, the Office of Congressional Workplace Rights ("OCWR"), "shall notify the employee in writing when the" 30-day "counseling period has ended." *Id.* § 1402(c); *see also id.* § 1402(b).[6]

Second, "[n]ot later than 15 days after receipt by the employee of notice of the end of the counseling period . . ., the covered employee who alleged a violation of a law shall file a request for mediation." *Id.* § 1403(a) (1995). Mediation "shall involve meetings with the parties separately or jointly for the purpose of resolving the dispute between the covered employee and the employing office." *Id.* § 1403(b)(2). The mediation period is also 30 days, and OCWR must notify the employee when the period has ended. *Id.* § 1403(c).

Third, "[n]ot later than 90 days after a covered employee receives notice of the end of the period of mediation, but no sooner than 30 days after receipt of such notification, such covered employee may either" file an administrative complaint with OCWR "or . . . file a civil action . . . in the United States district court for the district in which the employee is employed or for the District of Columbia." *Id.* § 1404 (1995).

When an employee elects the civil action path, § 1408(a) provides that "[t]he district courts of the United States shall have jurisdiction over any civil action commenced under [§ 1404] and this section by a covered employee who has completed counseling under [§ 1402]

[6] OCWR was formerly known as the Office of Compliance and is referred to by that name in the applicable version of the CAA.

and mediation under [§ 1403].” *Id.* § 1408(a) (1995). Highlighting the need for administrative exhaustion, § 1408(a) adds: “A civil action may be commenced by a covered employee only to seek redress for a violation for which the employee has completed counseling and mediation.” *Id.* Likewise, § 1410 states that “[e]xcept as expressly authorized by sections [1407, 1408, and 1409] . . ., the compliance or noncompliance with the provisions of this chapter and any action taken pursuant to this chapter shall not be subject to judicial review.” 2 U.S.C. § 1410 (1995).

Amendments to the CAA on December 21, 2018, after the plaintiff was terminated but before she filed this suit, altered the pre-suit administrative processes and revised § 1408, the provision granting jurisdiction to federal courts. Correctly, neither party disputes that the pre-amendment version of the CAA applies here. *See* Def.’s Mem. at 1 n.1 (noting the amendments but stating that they do not apply); *see generally* Pl.’s Opp’n (neglecting to address the amendments).[7]

### B. Claims of Age Discrimination and National Origin Discrimination and Retaliation

Turning now to the plaintiff’s claims, the Court lacks jurisdiction over Count V, alleging age discrimination; over Count II, alleging national origin discrimination; and over Count IV, alleging retaliation based on national origin. Although the plaintiff raised age discrimination and national origin discrimination and retaliation in matters 19-AC-04 and 19-AC-26, *see* 19-AC-04

---

7 When, as here, “a case implicates a federal statute enacted after the events in suit, the court’s first task is to determine whether Congress has expressly prescribed the statute’s proper reach.” *Landgraf v. USI Film Prod.*, 511 U.S. 244, 280 (1994). Congress commanded that the new CAA amendments should not apply to proceedings like this one pending on the date the amendments became effective. Specifically, the 2018 Reform Act stated that “this Act and the amendments made by this Act shall take effect upon the expiration of the 180-day period which begins on the date of the enactment of this act.” Pub. L. No. 115-397 § 401(a), 132 Stat. 5297, 5327 (2018). That 180-day period, which started December 21, 2018, expired on June 19, 2019. Congress added, however, that “[n]othing in this Act or the amendments made by this Act may be construed to affect any proceeding . . . to a claim under . . . the Congressional Accountability Act . . . which is pending as of the date after that 180-day period.” *Id.* § 401(b). By June 20, 2019, the date after the expiration of the 180-day period, this suit, filed on May 1, 2019, was pending. As a result, the amendments may not be construed to affect the plaintiff’s proceeding. *See Landgraf*, 511 U.S. at 280 (holding that where a statute contains an “express command” about the temporal reach of the provisions, that command governs).

Mediation Notice at 1 (identifying the issues of "harassment, disparate treatment, hostile work environment, and termination because of age, national origin, disability, sex, and reprisal"); 19-AC-26 Mediation Notice at 1 (identifying as topics for mediation "inaccurate compensation, damaged reputation, false accusations, fraudulent statements, unlawful procurement of medical records, production of inaccurate pay records, denied investigation, and interference with Workers' Compensation process because of age, national origin, and reprisal"), neither matter properly exhausted those claims.

This suit was filed too soon after 19-AC-26 to bring any claims raised in that administrative matter. Section 1404 requires an employee to file any civil action "[n]ot later than 90 days after a covered employee receives notice of the end of the period of mediation, but no sooner than 30 days after receipt of such notification." 2 U.S.C. § 1404 (1995). Yet, notice of the end of the mediation period for 19-AC-26 was sent to the plaintiff via first class mail on May 1, 2019, the very day she filed this suit. *See* 19-AC-26 End of Mediation Notice. As a result, 19-AC-26 cannot be the administrative basis for Counts II, IV, and V, or indeed for any other claims in this suit.

Nor can 19-AC-04 be the administrative basis for any claims of discrimination in this suit. The 180-day window preceding 19-AC-04 opened on April 15, 2018, the day after the plaintiff was terminated. As a result, 19-AC-04 could not have timely raised any claims based on the plaintiff's termination or any claims based on conduct that occurred during the plaintiff's employment. *See* 2 U.S.C. § 1402(a) (1995) ("A request for counseling shall be made not later than 180 days after the date of the alleged violation."); *see also, e.g., Bradshaw v. Office of Architect of Capitol*, 856 F. Supp. 2d 126, 136 (D.D.C. 2012) (dismissing claims based on

conduct "that took place more than 180 days before the plaintiff sought counseling as required in order to bring a claim under the CAA").[8]

19-AC-04 could have timely raised claims based on post-employment conduct, but post-employment conduct cannot undergird an employment discrimination claim. The gravamen of any such claim, whether based on a discrete-act or a hostile environment theory, is that the employer's biased conduct impacted the terms and conditions of the plaintiff's employment. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) (explaining that the discrimination provision of Title VII "is . . . limited to discriminatory actions that affect the terms and conditions of employment"); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (defining a discriminatorily hostile work environment as one "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" (internal citation omitted) (internal quotation marks omitted)).[9] No terms and conditions of the plaintiff's employment existed to be impacted on April 15, 2018, the day after she was terminated and the day 19-AC-04's 180-day window opened. 19-AC-04, then, could not have timely raised and properly exhausted any actionable claims of discrimination. *See Slate v. Pub. Def. Serv. for D.C.*, 31 F. Supp. 3d 277, 303 (D.D.C. 2014) (deeming claim untimely because the plaintiff was suspended and barred from coming to work during the applicable filing window, so "if the plaintiff could

---

[8] The plaintiff does not allege that she learned of her termination later than April 14, 2018, *see* FAC ¶ 176 (alleging that the plaintiff was terminated on April 14, 2018), nor does she argue that the 180-day period begins to run on the date the plaintiff discovered the violation rather than on the date that the violation occurred. In any event, "the discovery rule does not save [a] plaintiff's claims under the CAA, where the statute of limitations is a jurisdictional bar." *Bradshaw*, 856 F. Supp. 2d at 138 (Howell, J.).

[9] Courts rely on case law interpreting the statutes incorporated into the CAA when interpreting the CAA. *See, e.g.*, *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 492 (D.C.Cir.2008) (observing that Title VII "applies to offices in the Legislative Branch as a result of the Congressional Accountability Act" and analyzing CAA discrimination and hostile work environment claims as Title VII claims); *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 15 (D.C.Cir.2006) (presuming that Title VII principles apply to CAA claim).

not access the workplace after his suspension, an act of discrimination could not have occurred within the filing period").[10] Counts II and V, which raise discrimination claims allegedly exhausted in 19-AC-04, are thus dismissed for lack of jurisdiction.[11]

Although post-employment conduct may be the basis for a claim of retaliation, 19-AC-04 did not raise or exhaust any such retaliation claim. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008) (explaining that retaliation claims "may extend to harms that are not workplace-related or employment-related so long as 'a reasonable employee would have found the challenged action materially adverse'" (quoting *Burlington N.*, 548 U.S. at 64)). Although Count IV, which raises the retaliation based on national origin claim, does not specifically refer to any post-employment conduct, Count IV incorporates all earlier allegations, and, elsewhere, the complaint alleges the following post-employment conduct: (1) in June 2018, AOC refused to provide a final timesheet and pay records, FAC ¶ 181; (2) due to the OIG's finding that the plaintiff had submitted fraudulent information in support of her worker's compensation claim, the plaintiff "did not receive wage loss pay" for the year she was absent, *id.* ¶ 181; and (3) in August 2018, the OIG reported false information about the plaintiff, *id.* ¶ 204. This post-employment conduct was plainly raised, counseled, and mediated in 19-AC-26, not in 19-AC-04,

---

10 "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Timeliness is evaluated differently in a hostile work environment claim. In that context, "[p]rovided that" even one "act contributing to" the claim "occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117; *see also Ham v. Ayers*, No. CV 15-1390 (RMC), 2019 WL 1202453, at *4 (D.D.C. Mar. 14, 2019) (applying this rule to a claim under the CAA). Given that the plaintiff had already been terminated by the time the 180-day window for counseling in 19-AC-04 began, not a single act contributing to a hostile work environment could have occurred within that window. *See Slate*, 31 F. Supp. 3d at 303 (deeming hostile work environment claim untimely because plaintiff, suspended from work, could not have been in the workplace to experience discrimination during the filing window).

11 The defendant makes the alternative argument that 19-AC-04 cannot be the administrative basis for any claims because the complaint does not allege that the plaintiff actually "engaged in mediation with Defendant in" 19-AC-04, Def.'s Mem. at 23, but, as explained *infra* Section III.F.1, the CAA does not require that the plaintiff prove her claims were in fact mediated, just that she sought counseling and that the mediation period was completed. The defendant's identical argument about 18-AC-63, *see* Def.'s Mem. at 23, fails for the same reason.

however. The mediation notice for 19-AC-26 stated the issues as "inaccurate compensation, damaged reputation, false accusations, fraudulent statements, unlawful procurement of medical records, production of inaccurate pay records, denied investigation, and interference with Workers' Compensation process because of age, national origin, and reprisal." 19-AC-26 Mediation Notice at 1; *compare* 19-AC-04 Mediation Notice at 1 (identifying as the topics that were counseled "harassment, disparate treatment, hostile work environment, and termination because of age, national origin, disability, sex, and reprisal"). Having raised a retaliation claim based on post-employment conduct in 19-AC-26 does not help the plaintiff, for the reasons already explained. Thus, Count IV is also dismissed for lack of jurisdiction.

The plaintiff argues that she "is entitled to equitable tolling of her claims" because she "diligently pursued exhausting the procedural requirements of the CAA before filing," Pl.'s Opp'n at 13, but equitable tolling is not available because the exhaustion requirements of the CAA are jurisdictional, *see Blackmon-Malloy*, 575 F.3d at 706 ("Because we hold that the CAA's counseling and mediation requirements are jurisdictional, the district court correctly ruled that it was not empowered to apply the equitable doctrine of vicarious exhaustion to excuse compliance with those requirements."). In a last-gasp effort to save this claim, the plaintiff contends that she could "amend her Complaint to completely demonstrate exhaustion." Pl.'s Opp'n at 14. Curing a failure to raise claims in counseling and mediation in a timely manner would require time travel, not more artful pleading, however. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (acknowledging that amendment would be "futile" where a claim is "time-barred").

### C. Claims of Disability Discrimination

The complaint raises two claims of disability discrimination, one under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12112, *et seq.*, *see* FAC ¶¶ 284–95 (Count VI), which

is incorporated into the CAA, *see* 2 U.S.C. § 1311(a)(3), and another under the Rehabilitation Act, 29 U.S.C. § 792, *see* FAC ¶¶ 296–304 (Count VII), also incorporated into the CAA, 2 U.S.C. § 1311(a)(3).[12] Both Counts VI and VII allege the same two theories: (1) that AOC discriminated against plaintiff based on disability "when it terminated her without just cause in April 2018," *id.* ¶ 293 (ADA); *id.* ¶ 302 (Rehabilitation Act), and (2) that AOC discriminated against plaintiff based on disability by "initiat[ing] an OIG investigation into her based on false allegations of workers' compensation fraud and of fabricating a workplace injury," *id.* ¶ 291 (ADA); *see also id.* ¶ 301 (Rehabilitation Act).[13] As discussed in more detail below, plaintiff is precluded from raising the first theory because she elected to pursue such a claim through the administrative channel in matter 18-AC-34. The second theory was not properly exhausted. Counts VI and VII will thus be dismissed for lack of jurisdiction.

#### 1. Plaintiff is Precluded from Raising Claim of Disability Discrimination Based on her Termination

Plaintiff raised allegations of disability discrimination in three administrative matters: 18-AC-34, 18-AC-63, and 19-AC-04. *See* 18-AC-34 Mediation Notice at 1 (involving "harassment, interference with [Family Medical Leave Act ("FMLA")], and termination because of disability and reprisal"); 18-AC-63 Mediation Notice at 1 (alleging "unfair terms and conditions, discipline, hostile work environment, and termination because of disability, and reprisal"); 19-AC-04 Mediation Notice at 1 (alleging "harassment, disparate treatment, hostile work environment, and termination because of age, national origin, disability, sex, and reprisal").

---

[12] Defendant incorrectly asserts that only the Rehabilitation Act is "applicable to the federal government." Def.'s Mem. at 2 n.2. The CAA extends the protections of both "section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791) and sections 102 through 104 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112 to 12114)" to congressional employees. 2 U.S.C. § 1311(a)(3); *see also, e.g. Niles v. U.S. Capitol Police*, No. 16-CV-1209 (TSC), 2019 WL 1858503, at *3 (D.D.C. Apr. 25, 2019) ("The Congressional Accountability Act extends the protections of Title I of the ADA to certain legislative branch employees.").

[13] Plaintiff describes Counts VI and VII as raising "claims of disability discrimination and retaliation," Pl.'s Opp'n at 10, but the amended complaint nowhere mentions retaliation based on disability.

Defendant argues, and plaintiff concedes, that plaintiff's decision to pursue one of these matters, 18-AC-34, through the administrative channel precludes her from bringing in federal court any claims raised in 18-AC-34, including the claim of disability discrimination based on her termination. *See* Def.'s Mem. at 17; *see also* Pl.'s Opp'n at 12 (stating that "the decision to pursue those particular claims discussed in 18-AC-34 in an administrative hearing precluded Kabakova from also pursuing 18-AC-34 in federal court"). The parties are correct.

Under the CAA version applicable here, courts undoubtedly lack jurisdiction over suits filed while a parallel administrative complaint is pending. *See Delfani v. U.S. Capitol Guide Bd.*, No. 03-cv-0949 (RWR), 2005 WL 736644, at *4–5 (D.D.C. Mar. 31, 2005), *aff'd*, 198 F. App'x 9 (D.C. Cir. 2006) ("The district court lacked subject matter jurisdiction because the plaintiff had an administrative complaint pending when she filed this civil action."); *Rucker v. Architect of the Capitol*, No. CIV. 10-CV-1483 (RLW), 2012 WL 4498053, at *1 (D.D.C. Sept. 30, 2012) (same). Here, though, the plaintiff's administrative complaint was withdrawn with prejudice on February 25, 2019, *see* 18-AC-34 Order at 1–3, before she filed this suit, on May 1, 2019, *see* Compl. The D.C. Circuit has left open the question "whether a claimant's election of the administrative option is irrevocable such that any later-filed civil action in the district court must be dismissed," *Delfani*, 198 App'x at 9, but the text of the CAA and the facts here show that the administrative complaint in 18-AC-34 precludes the plaintiff from bringing in this suit any claims raised in 18-AC-34.

Section 1404 of the CAA permits "covered employee[s]" to "*either* . . . file a complaint with [OWCR] . . . *or* . . . file a civil action." 2 U.S.C. § 1404 (1995) (emphasis added); *see also Delfani*, 2005 WL 736644, at *4 ("[S]ection 1404 . . . limits a covered employee to filing either an administrative action or a civil action."). Further, § 1408, the CAA provision granting

jurisdiction to federal courts, "limits the court's jurisdiction to matters 'commenced under section 1404 of [the CAA],'" thus "mak[ing] clear that jurisdiction lies over actions that conform with the election procedures of section 1404." *Delfani*, 2005 WL 736644, at *4 (alteration in original) (quoting 2 U.S.C. § 1404 (1995)). A civil action that seeks redress for violations already pursued in an administrative complaint does not "conform with the election procedures of section 1404." *Id.* A federal district court thus lacks jurisdiction over such a civil action.

That the plaintiff withdrew her administrative complaint does not change this conclusion, especially given that the withdrawal was deemed by the hearing officer to be with prejudice. Under the scheme in place at the time, if the plaintiff disagreed with the hearing officer's decision to permit withdrawal with prejudice, her recourse was to appeal the hearing officer's order to the Board of Directors of the Office of Compliance, *see* 2 U.S.C. § 1406 (1995), and then to the Court of Appeals for the Federal Circuit, *see id.* § 1407 (1995). Allowing plaintiffs to pursue in federal district court claims discharged with prejudice in the administrative channel would circumvent the system designed by Congress, which requires plaintiffs to choose — *either* administrative complaint *or* civil action — and provides for appellate procedures, terminating in different federal circuit courts, within each channel. *Cf. Halcomb v. Office of Sergeant-At-Arms of U.S. Senate*, No. 01-cv-01428 (RBW), 2007 WL 2071684, at *4 (D.D.C. July 13, 2007), *aff'd sub nom. Halcomb v. Office of Senate Sergeant-at-Arms*, 368 F. App'x 150 (D.C. Cir. 2010) (dismissing for lack of jurisdiction claims that the plaintiff had pursued through an administrative hearing and appeal to the Board of Directors of the Office of Compliance because the "CAA confers exclusive jurisdiction over a decision of the Board of Directors of the Office of Compliance on the Federal Circuit").

Although plaintiff concedes that she may not "pursu[e] 18-AC-34 in federal court," she argues that she may raise claims pursued in that administrative matter that were later raised again in other administrative matters. Pl.'s Opp'n at 12. Not so. Plaintiff's pursuit of a claim of disability discrimination based on her termination in 18-AC-34, and the withdrawal of that claim with prejudice, mean that she was precluded from raising the same claim of disability discrimination based on her termination again in any later administrative matters. Thus, the plaintiff could not have properly exhausted the termination claim in a later matter.

In short, under § 1404 and § 1408, this Court lacks jurisdiction over the plaintiff's claim of disability discrimination based on her termination.

**2. Jurisdiction Is Lacking Over a Disability Discrimination Claim Based on Any Other Theory**

Plaintiff also raised claims of disability discrimination in administrative matters 18-AC-63 and 19-AC-04, but neither can be the basis for the disability discrimination claims in Counts VI and VII. As already discussed, *supra* Section III.B, matter 19-AC-04 cannot be the administrative basis for any claims of discrimination because neither plaintiff's termination nor any pre-termination conduct could have been timely counseled in 19-AC-04. 18-AC-63 also cannot be the administrative basis for any actionable claim of disability discrimination because no adverse employment action occurred within the 180-day period preceding her request for counseling in that matter, which period ran from February 18, 2018 to August 17, 2018.

Every claim of discrimination has "two essential elements:" "that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch*, 550 F.3d at 1196 (applying this framework to claims including a disability claim under the Rehabilitation Act); *Redmon*, 80 F. Supp. 3d at 85 (applying this framework to claims of Rehabilitation Act and ADA discrimination brought under

the CAA). An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003). Many workplace slights, "such as dissatisfaction with a reassignment, public humiliation, or loss of reputation" do not rise to the level of actionable adverse actions. *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006). "[T]he threshold" for an adverse action "is met" only "when an employee 'experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'" *Id.* (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)).

The OIG investigation alleged as a basis for disability discrimination in Counts VI and VII, *see* FAC ¶ 291 (ADA); *see also id.* ¶ 301 (Rehabilitation Act), is not an adverse employment action.[14] "Although the discipline imposed as a result of an investigation may have a sufficiently adverse effect on plaintiff's employment to be [an] actionable" adverse action, "the mere initiation" or completion "of [an] investigation does not." *Ware v. Billington*, 344 F. Supp. 2d 63, 76 (D.D.C. 2004); *see also Mack v. Strauss*, 134 F. Supp. 2d 103, 114 (D.D.C. 2001) ("[M]ere investigations by plaintiff's employer cannot constitute an adverse action because they have no adverse effect on plaintiff's employment."), *aff'd*, *2001 WL 1286263* (D.C. Cir. Sept. 28, 2001) (affirming that plaintiff "has failed to show that he suffered an adverse employment action"); *Haddon v. Exec. Residence at White House*, 313 F.3d 1352, 1363 (Fed. Cir. 2002) ("Internal investigations such as the one at issue here generally do not qualify as adverse

[14] The Court assumes that this theory was properly exhausted because the theory fails even if properly exhausted. Indeed, that assumption has some basis, as the 180-day period preceding the request for counseling for 18-AC-63 opened on February 18, 2018, before the April 1 completion of the investigation.

employment actions.”); *compare King v. Holder*, 77 F. Supp. 3d 146, 151 (D.D.C. 2015) (holding that the plaintiff's held-up promotion, which was stalled because of an OIG investigation, was an adverse employment action). According to the complaint, the OIG investigation into the plaintiff's injury benefits claims was initiated in November 2017, *see* FAC ¶ 141, and completed by April 1, 2018, the day the findings were reported to Congress, *see* FAC ¶ 144. The complaint does not assert that the completion of the investigation triggered any material changes to her employment in the two weeks between April 1 and her termination on April 14.

Two other events allegedly transpired in the portion of the 180-day window for counseling 18-AC-63 before the plaintiff's termination, but neither qualifies as an adverse employment action. The complaint alleges that, on February 25, 2018, plaintiff sent an email to "Director Stephen Ayers requesting help resolving her timesheet issues, her removal from the email list, and concerns about Agency safety," FAC ¶ 163, and that, on March 14, 2018, plaintiff "spoke with Deputy Chief Human Capital Officer for Operations John McPhaul" about the same issues, *id.* ¶ 167. In the course of these conversations, the plaintiff asked Ayers and McPhaul to report some of her concerns about Kelly to the AOC OIG. *Id.* ¶¶ 165, 170. Ayers and McPhaul, the complaint asserts, "did not forward Kabakova's concerns to the OIG." *Id.* ¶ 166 (Ayers); *see also id.* ¶ 171 (McPhaul). Failing to forward complaints to the OIG is not an adverse employment action, as such an omission causes no change at all in employment conditions.

* * *

The plaintiff's decision to pursue her disability-discrimination termination claim in the administrative channel precludes her from raising such a claim in federal court. In addition, no adverse employment action occurred in the 180-day window preceding 18-AC-63 that could

support a claim of disability discrimination in federal court. As a result, Counts VI and VII are dismissed.

### D. Claim of Retaliation for Whistleblowing

Count VIII of the complaint alleges that "AOC violated the Whistleblower Protection Act (WPA) of 1983, 5 U.S.C. § 2302(b)(8)–(9) and Section 11(c) of the Occupational Health and Safety Act (OSHA) of 1970, as incorporated with respect to AOC by the CAA," by retaliating against plaintiff for "reporting OSHA and safety violations by her supervisor." FAC ¶ 308. This Count is dismissed without prejudice for failure to state a claim on which relief can be granted.

To start, the WPA does not apply to legislative branch employees and, thus, plaintiff cannot obtain relief under that Act. *See* 5 U.S.C. § 2302(a)(2)(B) (defining "covered positions" to include only executive branch positions); *id.* § 2302(a)(2)(C) (defining "agency" to include executive agencies); *see also* S. 2723, 114th Cong. (2016) (proposing to amend the CAA to extend the protections of the WPA to congressional employees); 2 U.S.C. 1311(a) (listing the statutes incorporated into the CAA but not listing the WPA). The CAA does require covered legislative agencies to comply with "the provisions of section 5 of [OSHA]," 2 U.S.C. § 1341(a)(1) (1995), and prohibits "reprisal against . . . any covered employee because the covered employee has opposed any practice" "made unlawful by [the CAA]," *id.* § 1317(a), including failure to observe OSHA requirements, *see Duncan v. Office of Compliance*, 541 F.3d 1377, 1380 (Fed. Cir. 2008) ("[T]he CAA unambiguously extends its anti-reprisal protections to OSHA-related claims."); *Clendenny v. Architect of the Capitol*, 236 F. Supp. 3d 11, 17 (D.D.C. 2017) (same).

The complaint does not come close to pleading plausibly that the plaintiff "opposed any practice made unlawful by" the CAA and OSHA. The complaint makes two brief allegations

related to safety violations: (1) that "[i]n late March 2017, Kabakova told Kelly that he was violating several safety policies and . . . standard operating procedures," FAC ¶ 101, and (2) that in April 2017, "Kelly refused to cooperate" with safety inspections, "a refusal that willfully violated safety requirements," *id.* ¶ 100. These "threadbare" allegations, devoid of specific facts, amount to "mere conclusory statements" and cannot support a "reasonable inference" that the plaintiff engaged in protected opposition to violations of the CAA and OSHA. *Iqbal*, 556 U.S. at 678.

### E. Claims of Discrimination and Retaliation Based on Sex

Finally, the complaint alleges that plaintiff suffered discrimination based on sex in the form of discrete acts and a hostile work environment and retaliation based on sex in the form of discrete acts and a hostile work environment. *See* FAC ¶¶ 212–225 (Count I – discrimination); *id.* ¶¶ 24–54 (Count III – retaliation). Defendant argues that plaintiff failed to exhaust these claims and that, even if exhausted, these claims should be dismissed for failure to state a claim. These arguments are addressed in turn.

#### 1. Exhaustion of the Discrimination and Retaliation Based on Sex Claims

Plaintiff argues that she exhausted her claims of discrimination and retaliation based on sex in administrative matter 18-AC-53, where, on the request for counseling, she handwrote as the "basis for filing," "gender discrimination" and "retaliation (complaints about sex harassment, gender discrimination, workplace safety)" and "hostile work environment." Formal Request for Counseling at 1. In the request for counseling's space to describe "What Happened," the plaintiff added, "Mr. Kelly subjected me to quid pro quo sexual harassment and hostile work environment" and "retaliation (complaints about sex harassment, gender discrimination, hostile work environment . . . )." *Id.* at 2. Defendant counters that, despite their appearance on the request for counseling, these claims were not in fact counseled or mediated, *see* Def.'s Reply at

4, 8, pointing to the Notice of Invocation of Mediation, which identified the allegations at issue as "unfair terms and conditions, denial of a step increase, interference with processing of benefits and Worker's Compensation claim because of disability, and reprisal," 18-AC-53 Mediation Notice at 1.

Here, the request for counseling establishes that the plaintiff sought counseling on claims of sex discrimination and retaliation based on sex in 18-AC-53. The plaintiff then sought mediation in that administrative matter and filed this suit within 90 days of the end of the mediation period. Under the D.C. Circuit's interpretation of the counseling and mediation requirements, this timeline shows that she "completed counseling . . . and mediation," under 2 U.S.C. § 1408(a) (1995), on the sex discrimination and retaliation claims, *see Blackmon-Malloy*, 575 F.3d at 713 ("[T]he reference in section 1408(a) to '[c]ompleted counseling . . . and mediation' means no more than that the employee timely requested counseling and mediation, that the employee did not thwart mediation by failing to give notice of his or her claim to the employing office upon request, that the mandated time periods have expired, and that the employee received end of counseling and mediation notices from the Office." (quoting 2 U.S.C. § 1408(a) (1995)).

The discrepancy identified by defendant does not defeat this showing. "[U]nlike agency exhaustion in other contexts, the purposes of counseling and mediation" under the CAA "are not to compile a record for judicial review but instead simply to afford the employee and the employing office an opportunity to explore and possibly resolve the employee's claims informally." *Id.* at 711. In light of these purposes, the D.C. Circuit has rejected an "'actual mediation' standard" for CAA claims, cautioning that "[n]othing in the CAA suggests Congress intended courts to engage in a mini-trial on the content of the counseling and mediation sessions,

an inquiry that would be fraught with problems." *Id.* Contrary to defendant's suggestion, then, the Court need not draw factual inferences about the extent to which plaintiff's claims of sex-based discrimination and retaliation were in fact counseled or mediated. The record establishes that plaintiff raised those claims in 18-AC-53 and then saw that matter through to the end of mediation. *See Blackmon-Malloy*, 575 F.3d at 714 ("[T]he receipt of end of mediation notices documented completion of counseling and mediation under section 1408(a).").

**2. Evaluation of the Claims of Discrimination and Retaliation Based on Sex**

As stated, Count I of the complaint alleges discrimination based on sex in the form of discrete discriminatory actions and a hostile work environment. *See* FAC ¶¶ 212–225. Count II asserts retaliation based on sex in the form of materially adverse actions and a hostile work environment. *Id.* ¶¶ 24–54. These theories are addressed in turn.

**a. Count I: Discrete Act Discrimination**

Count I alleges the following discrete acts: (1) the termination of "Kabakova's telework agreement," FAC ¶ 219; (2) "den[ying] her permission to attend trainings and conferences," *id.* ¶ 220; (3) "refus[ing] to approve or participate in her inspections and investigations," *id.* ¶ 221; and (4) "initiat[ing] an OIG investigation into her," *id.* ¶ 222, and (5) "report[ing] false allegations" of "worker's compensation fraud" to DOL, *id.* ¶ 223. These alleged actions cannot be the basis for a timely claim of discrimination.

For one, denial of telework, denial of permission to attend trainings, and initiating investigations are not the types of actions that qualify as adverse employment actions. *See, e.g.*, *Redmon*, 80 F. Supp. 3d at 87 ("Courts in this and other jurisdictions have repeatedly held that denial of a telework arrangement on its own does not constitute an adverse employment action."); *Artis v. D.C.*, 51 F. Supp. 3d 135, 140 (D.D.C. 2014) ("The Court of Appeals has not specifically addressed this issue, but the overwhelming consensus on the District Court seems to

be that the denial of training opportunities may constitute an adverse action only if the plaintiff can link that denial to a tangible, negative employment consequence."); *Ware* 344 F. Supp. 2d at 76 (holding that "the mere initiation of [an] investigation does not" constitute an adverse employment action). Even if one of the alleged discrete acts did rise to that level, however, the derivative claim of discrimination would be time barred, *see Morgan*, 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."); *see also, e.g.*, *Ross v. U.S. Capitol Police*, 195 F. Supp. 3d 180, 196 (D.D.C. 2016) (applying this rule to a claim brought under the CAA), because none of the identified acts — termination of the telework agreement, denial of permission to attend trainings, refusing to participate in inspections, initiating investigations — occurred within the 180-day window preceding the request for counseling in 18-AC-53, which period began on January 14, 2018, *see* FAC ¶ 29 (termination of telework agreement "[s]hortly after Kelly began" in March 2016); *id.* ¶ 104 (denial of permission to attend training in March 2017); *id.* ¶ 98 (refusal to participate in inspections around April 2017); *id.* ¶ 141 ("In November 2017, Kelly initiated an OIG complaint . . . .").

Although the plaintiff's termination does fall within the window for counseling in 18-AC-53, and termination is an adverse employment action, *see Holcomb*, 433 F.3d at 902, termination is not mentioned in Count I of the complaint. The allegations incorporated by reference into Count I do not plausibly plead a required element of a discrimination claim based on termination: that the plaintiff was terminated "because of . . . sex." 42 U.S.C. § 2000e–2(a); *Baloch*, 550 F.3d at 90 (stating the required elements of a discrimination claim); *see also Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (applying Title VII as incorporated into the CAA). Instead, the complaint alleges as to the termination: "On April 14,

2018, Kabakova was terminated because, according to AOC, she had not fully recovered from her injury in April 2017 and did not come to work." FAC ¶ 176.[15]

Given the presence of this "legitimate, non-discriminatory reason for the challenged" termination, *Brady*, 520 F.3d at 493, the question is whether plaintiff has plausibly pled that her absence between April 2017 and April 2018 "was not the actual reason" for her termination and that instead "the employer intentionally discriminated against [her] on the basis of . . . sex," *id.* at 494; *see also Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 90 (D.D.C. 2009) (adapting this standard, which is typically applied at summary judgment, to the motion to dismiss stage); *Moore v. Castro*, 192 F. Supp. 3d 18, 40 (D.D.C. 2016) (making the same adaptation). "[T]he threshold for pleading facts in support of" such an inference "is a low one" that can be cleared by alleging facts to support an inference "that the employer's proffered reasons for the adverse employment actions is false" *or* by alleging "specific instances where similarly situated persons outside of [her] protected class received more favorable treatment." *See Nurriddin*, 674 F. Supp. 2d at 90–91; *see also Brady*, 520 F.3d at 495 ("A plaintiff . . . may try in multiple ways to show that the employer's stated reason for the employment action was not the actual reason (in other words, was a pretext)," including "comparative evidence" and undermining the stated reason); *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (holding that plaintiff need not present evidence of differential treatment because "[e]limination of [employer's legitimate] reasons . . . is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one"); *Slate*, 31 F. Supp. 3d at 297–98 (examining the same two possibilities in granting a motion to dismiss a Title VII gender discrimination claim); *Castro*, 192 F. Supp. 3d at 40 ("[B]y claiming

[15] That paragraph of the complaint also states that "[t]his contradicts OIG fraud determination and Kelly's fraud allegations," FAC ¶ 176, but the relevance of this statement is elusive because the plaintiff does not assert that she returned to work after April 2017, or that OIG found she had done so.

that [the employer]'s proffered reasons for his termination are false and that younger, female, non-African-American . . . employees were retained, [the plaintiff] has also alleged facts that could establish that his termination was because of age, gender, or race."). Plaintiff does not dispute that she was absent from work for a year, nor does the complaint provide any other support for an inference that the proffered reason for her termination was false or pretextual. *See, e.g.*, *Slate*, 31 F. Supp. at 297–98 (dismissing gender discrimination claim for failure to state a claim where "there is nothing to support a causal inference that gender was [the employer's] motivating factor, other than the plaintiff's conclusory allegations"); *George*, 407 F.3d at 412 (explaining that discriminatory motive can be established by undermining the employer's legitimate, non-discriminatory reason but that such undermining requires some "showing that the discharge was not attributable to the . . . legitimate reasons for discharge"); *Brady*, 520 F.3d at 495 (observing, at summary judgment, that "the employee may attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision."). Nor does the complaint allege any facts to support an inference that men were retained under similar circumstances. *See Slate*, 31 F. Supp. at 298 (granting a motion to dismiss a gender discrimination claim where complaint "does not plead facts to show differential treatment based on gender"). The complaint thus fails to plead plausibly that the plaintiff was terminated because of her sex.

In sum, the discrete acts alleged in Count I cannot support a timely claim of discrimination, and the complaint fails to state a claim of sex-based discrimination based on the plaintiff's termination.

**b. Count I: Hostile Work Environment**

Count I also asserts that defendant discriminated against plaintiff based on her sex "when it knowingly and intentionally . . . created a hostile work environment." FAC ¶ 217. Defendant

first argues that this hostile work environment claim is untimely because no conduct within the 180-day window preceding the request for counseling in 18-AC-53 "could be plausibly characterized as forming the basis for a . . . gender-based . . . hostile work environment claim." Def.'s Reply at 9; *see also* Def.'s Mem. at 16–18. As defendant acknowledges, however, *see* Def.'s Reply at 9, "[p]rovided that an act contributing to" the hostile work environment claim "occur[ed] within the filing period, the entire time period of the hostile work environment may be considered," *Morgan*, 536 U.S. at 117. Here, though, defendant insists, "the limited conduct that is alleged in the Amended Complaint as occurring within the applicable window" — January 14, 2018 to April 14, 2018 — "is unrelated to the alleged conduct occurring outside that window" and therefore "cannot be combined with that earlier conduct to form a timely-raised hostile work environment claim." Def.'s Reply at 9–10.[16] The hostile work environment claim is timely but founders under Rule 12(b)(6).

Starting with the timeliness question, as alleged in the complaint, the hostile work environment consists of the events discussed in the prior section — ending the telework agreement, denial of permission to attend trainings, not participating in the plaintiff's inspections, and the OIG investigation, all events that occurred between Kelly's arrival in March 2016 and the OIG investigation's close in April 2018, FAC ¶¶ 219–222 — along with Kelly's comments and "inappropriate touching," which appear to have occurred between March and December 2016, *id.* ¶ 218. In the 18-AC-53 counseling window, between January 14, 2018 and April 14, 2018, the complaint alleges: (1) that plaintiff sent the already-discussed email to Ayers about "her timesheet issues, her removal from the email list, and concerns about Agency safety,"

[16] The full counseling window for 18-AC-53 is January 18, 2018 to July 13, 2018, but, as already explained *supra* note 9 and accompanying text, conduct after the plaintiff's termination on April 14, 2018 cannot anchor a hostile work environment claim.

FAC ¶ 163 (February 25, 2018); (2) that plaintiff "spoke with Deputy Chief Human Capital Officer for Operations John McPhaul" about the same issues, *id.* ¶ 167 (March 14, 2018); (3) that the OIG investigation wrapped up with a report to Congress on April 1, 2018, *id.* ¶ 144; and (4) that the plaintiff was terminated, *id.* ¶ 176.

Defendant argues that the events in the 18-AC-53 counseling window are different in kind because they occurred after the plaintiff stopped coming to work. *See* Def.'s Reply at 9–10. As support, defendant cites, *see id.* at 10, *Turner v. U.S. Capitol Police*, 653 Fed. App'x 1, 3 (D.C. Cir. 2016), and *Greer v. Paulson*, 505 F.3d 1306, 1315–16 (D.C. Cir. 2007), both of which involved "intervening actions" that "severed" an earlier period from a later one, rendering the later period outside the hostile work environment claim. *Turner*, 653 Fed. App'x at 3. The intervening acts in *Turner* and *Greer*, however, were actions *by the employer* in response to the employee's accusations of harassment: removal of supervisors, *id.*, and reassignment to new departments, *id.*; *see also Greer*, 505 F.3d at 1315. True, the employee in *Greer*, like plaintiff here, was absent from work in the later, severed period, *see Greer*, 505 F.3d at 1316 (explaining that the prior environment did not continue during the plaintiff's absence), but *Greer*'s conclusion was framed as turning not on the plaintiff's decision to stay home but on the employer's decision to reassign the plaintiff to a new department and supervisoronce the employer became aware of the alleged harassment, *see id.* at 1316; *see also Vickers v. Powell*, 493 F.3d 186, 199 (D.C. Cir. 2007) (deeming a "routine personnel action[]" not "intended to address" the hostile work environment insufficient to "sever the earlier incidents from the more recent incidents"). *Greer* was also careful to "reject[] a per se rule against considering" as part of a hostile work environment "incidents alleged to have occurred while an employee was physically absent from the workplace." *Greer*, 505 F.3d at 1314. Consistent with this reading of

*Greer*, in *Morgan*, the Supreme Court explained that an employee cannot recover for a prior act that bears "no relation to" timely acts, "or [that] for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim." *Morgan*, 536 U.S. at 118.

The completion of the OIG investigation and the report to Congress are "an act contributing to" the alleged hostile work environment that "occur[ed] within the filing period" so that "the entire time period of the hostile work environment may be considered." *Morgan*, 536 U.S. at 117. The investigation, termination, as well as the incidents alleged to have occurred in 2016 and 2017, can be considered as part of the same hostile work environment claim because they "'involve[] the same type of employment actions . . . and [are] perpetrated by the same managers." *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (alterations in original) (quoting *Morgan*, 536 U.S. at 120–21). The crux of the plaintiff's hostile work environment claim is that, for the approximately two years he was her manager, Kelly singled her out by inappropriately touching her, by stonewalling her attempts to telework, to attend trainings, and to perform inspections, and by leveling assertedly false accusations against her. The OIG investigation that Kelly allegedly initiated is part of this asserted pattern.

Nevertheless, even if the pre-2018 events are considered, plaintiff's hostile work environment claim fails. A hostile work environment is one "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris*, 510 U.S. at 21. "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201 (citing *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 787–88 (1998)). As the Supreme Court has put it, "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace . . . .'" *Faragher*, 524 U.S. at 787 (quoting B. LINDEMANN & D. KADUE, SEXUAL HARASSMENT IN EMPLOYMENT LAW 175 (1992)).

As just described, plaintiff's hostile work environment claim is centered on allegations that Kelly attempted to diminish her responsibilities, by stymieing her attempts to perform inspections in March 2017, *see* FAC ¶¶ 99–100, by assigning her menial tasks after she filed an EEO complaint, *id.* ¶ 73, and by attempting to diminish her privileges by pushing her to terminate her telework agreement in 2016, *id.* ¶ 29–35, and denying her permission to attend trainings on two occasions in 2016 and 2017, *id.* ¶¶ 41, 109. Kelly also allegedly subjected plaintiff to close scrutiny after her injury, by initiating the OIG investigation, *see id.* ¶ 141, and pushing AOC to oppose plaintiff's request for worker's compensation, *id.* ¶ 133.

Courts have frequently dismissed hostile work environment claims centered on similar allegations of conflict with a manager, occasional denial of privileges, minor changes to work duties, and close scrutiny. Such occurrences are not sufficiently offensive, intimidating, or out of the ordinary in a typical workplace to change the conditions of the plaintiff's employment. For example, *Moore v. U.S. Department of State*, 451 F. Supp. 76 (D.D.C. 2019), dismissed a hostile work environment claim based on allegations of a falsely initiated OIG investigation, denial of promotions, disputes about work product, and a higher-up's suggestion that the plaintiff seek work elsewhere. *Id.* at 91. The court there concluded that these "various performance- and promotion-related allegations were not intimidating or offensive enough to be considered harassment." *Id.* at 92. Similarly, in *Nurriddin v. Bolden*, 674 F. Supp. 2d 64 (D.D.C. 2009), the

plaintiff alleged that his managers "passed him over for performance awards, lowered his performance evaluations, unfairly reprimanded and criticized him, made disparaging remarks . . ., closely scrutinized his work, refused him a window cubicle, removed some of his duties, and denied his requests to travel," as well as "that, after he developed health problems, management denied many of his leave requests and engaged in a series of discussions to end his eligibility for workers' compensation and to terminate his employment . . . , before finally firing him." *Id.* at 93. Granting a motion to dismiss the hostile work environment claim, *Nurriddin* concluded that the "plaintiff has fallen far short of alleging conduct that . . . amounts to 'intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment.'" *Id.* at 94 (quoting *Harris*, 510 U.S. at 21); *see also Outlaw v. Johnson*, 49 F. Supp. 3d 88, 92 (D.D.C. 2014) (dismissing for failure to state a claim a hostile work environment count "referring only to promotion denials, a subjective performance review, and being hired at a lower grade than Caucasian employees"); *Laughlin v. Holder*, 923 F. Supp. 2d 204, 219–20, 221 (D.D.C. 2013) (deeming insufficient allegations of denied promotions and bonuses, interference with efforts to carry out certain job duties, pressure to retire); *cf. Baloch*, 550 F. 3d at 1201 (concluding from the record at summary judgment that the plaintiff "clashe[d] with his supervisor in the workplace" but finding no hostile work environment where the plaintiff's supervisor criticized the plaintiff's work, restricted his leave, verbally fought with the plaintiff, and threatened his arrest). As in *Moore*, *Nurriddin*, and other cases, the alleged interference with some of plaintiff's job duties over two years, pressure to end her telework agreement, refusal to allow plaintiff to attend trainings, and scrutiny of plaintiff's workplace injury are not so severe or pervasive as to be objectively hostile or abusive. *See Harris*, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively

hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview.").

The complaint also fails to allege the sort of "deeply offensive" discriminatory comments or conduct that might, combined with the allegations of interference and denied privileges, state a hostile work environment claim. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (per curiam) (concluding that a hostile work environment claim based on use of a "deeply offensive racial epithet," another racially offensive comment, denial of a raise, and documented medical leave due to workplace stress survived summary judgment). For example, in *Wise v. Ferriero*, 842 F. Supp. 2d 120 (D.D.C. 2012), a hostile work environment claim survived a motion to dismiss "if not by much," by alleging threats of discipline based on false accusations of misconduct, exclusion from trainings, denial of promotions, and, critically, a manager's use of a racist epithet so "uniquely offensive" and severe "that the D.C. Circuit has suggested" its use "can create a hostile work environment by itself," *Moore*, 351 F. Supp. 3d at 93 (discussing *Wise* and *Ayissi-Etoh*). By contrast, Kelly's alleged touching of the plaintiff's knee and hair and his hugging her "on multiple occasions," *see* FAC ¶¶ 13, 15, while clearly "unwelcome and uncomfortable," are neither "severe enough" nor pervasive enough "to be actionable," *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000).

To be sure, a single incident of unwanted, inappropriate touching can support a hostile work environment claim if the physical contact is sufficiently severe, *see, e.g.*, *Redd v. New York Div. of Parole*, 678 F.3d 166, 179-80 (2d Cir. 2012) (harassment severe where supervisor touched plaintiff's breasts on three occasions); *Gerald v. Univ. of Puerto Rico*, 707 F.3d 7, 18 (1st Cir. 2013) (harassment severe where supervisor once "grabbed [plaintiff's] breasts" and also "sexually propositioned her, and crassly asked in front of others why she would not have sex

with him”), but the contact alleged here is not. As one court of appeals has put it, “[t]here are some forms of physical contact,” including “a hand on the shoulder, a brief hug, or a peck on the cheek,” which, “although unwelcome and uncomfortable for the person touched, are relatively minor” such that, they “typically will not be severe enough to be actionable.” *Hostetler*, 218 F.3d at 808. One measure of severity is whether the “physical contact surpasses what ‘(if it were consensual) might be expected between friendly coworkers.’” *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006) (quoting *Hostetler*, 218 F.3d at 808). Touching a person’s knee while delivering tough feedback and occasional hugging clearly do not cross that line. *See Hilt–Dyson v. City of Chicago*, 282 F.3d 456, 459, 463–64 (7th Cir. 2002) (harassment not severe where supervisor rubbed back and shoulders, which stopped after plaintiff complained); *see also Carter v. Greenspan*, 304 F. Supp. 2d 13, 25 (D.D.C. 2004) (harassment not severe where coworker “caressed” plaintiff’s knee, “placed her breast on [his] arm,” and “placed her fingers on [his] buttocks”). The hair touching, as currently alleged, is also not sufficiently severe to alter the terms and conditions of plaintiff’s employment. *See e.g., Burgess v. Dollar Tree Stores, Inc.*, 642 F. App’x 152, 153 (3d Cir. 2016) (harassment not severe where supervisor stroked plaintiff’s hair and made verbal sexual advance).

The threadbare nature of the allegations about the physical touching supports the conclusion that the complaint does not plead a hostile work environment. The sparse allegation about the hugging and hair touching — that, “[o]n multiple occasions, Kelly inappropriately touched Kabakova, including touching her hair and hugging her,” *see* FAC ¶ 15 — lacks facts about the context from which a court could draw a reasonable inference of severity. *See, e.g.*, *Patton*, 455 F.3d at 816 (“It is very important to focus intently on the specific circumstances of physical harassment.”); *see also Slate*, 31 F. Supp. 3d at 306 (dismissing a hostile work

environment claim in case where supervisor had allegedly touched the plaintiff's crotch because the context of the incident revealed it to be a common schoolyard prank, *id.* at 297). Compounding the problem for the plaintiff is a lack of specificity about the timeline and the frequency of the contact. Although the location of the allegations in the complaint indicates that the alleged touching occurred sometime between March and December 2016, the allegations have no dates attached, *see* FAC ¶¶ 13, 15, and the complaint also makes no attempt to quantify the number of occasions on which inappropriate touching occurred. These failures doom any attempt by the complaint to plead pervasive harassment.

In short, although the plaintiff's hostile work environment claim is timely, the complaint's allegations of, over two years, several instances of interference and denied privileges, of scrutiny of her injury claim, of an isolated gendered comment, occasional hugging and unwelcome touching of her hair and knee are not sufficiently severe or pervasive to state a hostile work environment claim.

**c. Count III: Retaliation**

Count III of the complaint alleges that plaintiff "engaged in protected activity when she reported Kelly's sexual harassment and discrimination to the Agency EEO office in December 2016." FAC ¶ 245. Defendant violated Title VII, as incorporated into the CAA, Count III continues, by (1) "subject[ing] Kabakova to a hostile work environment," *id.* ¶ 246; (2) "den[ying] her permission to attend trainings and conferences, despite allowing other male employees to attend such events," *id.* ¶ 247; (3) "sabatog[ing] her work, assign[ing] her menial tasks, and refus[ing] to approve or participate in her inspections and investigations," *id.* ¶ 248; (4) "initiat[ing] an OIG investigation into her based on false allegations," *id.* ¶ 249; (5) "report[ing] false allegations that Kabakova engaged in workers' compensation fraud to the Department of Labor," *id.* ¶ 250; and (6) "terminat[ing] her without just cause," *id.* ¶ 252.

As already explained, the complaint fails to allege harassment severe or pervasive enough to state a claim for hostile work environment discrimination. For the same reasons, Count III falls short of stating a claim for hostile work environment retaliation.

Also as already explained, the only discrete acts alleged in the complaint that occurred within the 180-day window preceding the request for counseling in the relevant matter, 18-AC-53, are the close of the OIG investigation and the plaintiff's termination in April 2018. *See supra* Section III.E.2.a. The denials to attend trainings, complained-of assignments, refusal to participate in inspections, initiation of the OIG investigation, and opposition of the DOL workers' compensation claim all occurred in 2016 and 2017, before the counseling window for 18-AC-53 opened on January 14, 2018. *See, e.g.*, FAC ¶ 104 (denial of permission to attend training in March 2017); *id.* ¶ 98 (refusal to participate in inspections around April 2017); *id.* ¶ 141 ("In November 2017, Kelly initiated an OIG complaint . . . ."); *id.* ¶ 156 (stating that DOL made a final determination on the workers' compensation claim in December 2017). Retaliation claims based on discrete acts other than the close of the OIG investigation or the plaintiff's termination are thus time-barred.

The complaint fails to "plausibly establish" a causal link between the alleged protected activity, the EEO complaint, and the close of the OIG investigation or the plaintiff's termination. *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Library of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013) (stating that to survive a motion to dismiss on a retaliation claim, plaintiffs must allege "sufficient factual matter" to "show (1) that an employee engaged in statutorily protected activity; (2) that the employee suffered a materially adverse action by the employee's employer; and (3) that a causal link connects the two" (internal quotation marks omitted)).

Starting with the completion of the OIG investigation, although the complaint alleges that Kelly knew of the EEO complaint, *see* FAC ¶ 61, and that Kelly "initiated [the] OIG complaint," *id.* ¶ 141, the complaint does not assert, let alone allege facts in support of a reasonable inference, that the AOC OIG knew of or was motivated to retaliate against the plaintiff for her 2016 EEO complaint. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (spotting no causal link between a discrimination complaint and an employment action 20 months later when there was no evidence the relevant supervisor knew of the complaint). In short, even assuming that the completion of the OIG investigation is a materially adverse action, that theory fails because the complaint is devoid of any link between the protected activity and the OIG's final report.[17]

Nor does the complaint plausibly plead a causal link between the EEO complaint and the plaintiff's termination. To be sure, Kelly and others at AOC who may have been involved in the termination decision knew of the EEO complaint, but pleading knowledge does not establish causality, especially when the temporal gap between the protected activity and the alleged adverse action is 16 months, *see Clark Cty. Sch. Dist.*, 532 U.S. at 274 ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) ("Temporal proximity can indeed support an inference of causation but only where the two events are 'very close' in time." (internal citation omitted)), and the complaint

[17] Under Title VII, as incorporated into the CAA, retaliation claims, unlike discrimination claims, "are 'not limited to discriminatory actions that affect the terms and conditions of employment' and may extend to harms that are not workplace-related or employment-related so long as 'a reasonable employee would have found the challenged action materially adverse.'" *Baloch*, 550 F.3d at 1198 n.4 (quoting *Burlington N.*, 548 U.S. at 68). A "materially adverse" action is one that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (quoting *Rochon*, 438 F.3d at 1219). The termination is a materially adverse action, but the completion of the OIG investigation, which is not alleged to have led to any "*material* adversity," *id.*, or "objectively tangible harm," *Holcomb*, 433 F. 3d at 92, may not be, *see Moore*, 351 F. Supp. 3d at 95 (concluding that a request for an investigation is not a materially adverse action and dismissing retaliation claim); *Harrington v. Crawford*, No. CV 19-0476 (ABJ), 2020 WL 1493918, at *5 (D.D.C. Mar. 27, 2020) (concluding that filing of a police report is not a materially adverse action and dismissing retaliation claim).

provides no other basis to infer that the EEO complaint caused the plaintiff's termination, *see, e.g.*, *Pueschel v. Chao*, No. 18-5330, slip op. at 7 (D.C. Cir. April 14, 2020) (holding that "the lack of temporal proximity prevents the court from drawing a reasonable inference of causality when no additional factual allegations support causation"); *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015) (holding that "alleging a five-month gap between [the employer's] knowledge of his discrimination complaint and his termination, supplemented by facts that rebut the two most common legitimate reasons for termination and also give rise to a reasonable inference of pretext," the plaintiff "render[ed] his claim of retaliation plausible"). As already discussed, the complaint provides no support for an inference that the proffered reason for plaintiff's termination — that she had not come to work for a year — was false or pretextual. The complaint does not state a claim for retaliation based on plaintiff's termination.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is granted. An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: April 14, 2020

BERYL A. HOWELL
Chief Judge